**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| INDAG GmbH & Co. Betreibs KG | ) | |
| and WILD PARMA S.r.L, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 15 C 4973 |
| | ) | |
| IMA S.P.A, IMA NORTH AMERICA, INC., | ) | |
| IMA INDUSTRIES, INC., IMA | ) | |
| INDUSTRIES NORTH AMERICA, INC., | ) | |
| and FILLSHAPE S.R.L., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

This is a case of alleged patent infringement and misappropriation of trade secrets

between a former employee, the employee, and the new employer.  Plaintiffs INDAG GmbH &

Co. Betriebs KG ("INDAG") and Wild Parma, S.r.L. ("Wild Parma," collectively with INDAG,

"Plaintiffs") filed a Complaint on June 5, 2015, against Defendants IMA S.p.A., IMA North

America, Inc. ("IMA North America"), IMA Industries Inc. ("IMA Industries"), IMA Industries

North America Inc. ("IMA Industries North America," collectively the "IMA Defendants"), and

FillShape S.r.l. ("FillShape," collectively with the IMA Defendants, "Defendants").  (*See*

*generally*, R.1, Compl.)  Plaintiffs allege that Defendants infringed U.S. Patent No. 7,648,017

("the '017 patent") by offering for sale within the United States pouch filling machinery.  (*Id.*,

¶¶ 42-49, Count I.)  Plaintiffs further allege a violation of the Illinois Trade Secrets Act, 765 Ill.

Comp. Stat. 1065/1 *et seq.* ("ITSA").  (*Id.*, ¶¶ 50-60, Count II.)  In the alternative to the ITSA

claim, Plaintiffs allege violations of the Italian Industrial Property Rights Code.  (*Id.*, ¶¶ 61-63,

Count III.)  Defendants filed a Motion to Dismiss Plaintiffs' Complaint on three grounds.  First, Defendants move for dismissal of Plaintiffs' Complaint under Rule 12(b)(2) on the basis that the Court cannot, consistent with due process, exercise personal jurisdiction over Defendants IMA S.p.A., IMA Industries North America, IMA North America, and FillShape (collectively, the "non-resident Defendants").  (*See* R.24.)  Second, Defendants move under Rule 12(b)(6) asserting that Count I of the Complaint fails to state a claim for patent infringement.  (*Id.*)  Lastly, Defendants move under Rule 12(b)(6) for dismissal of the claim of trade secret misappropriation under Illinois law (Count II) and Italian law (Count III) as to IMA Industries because Plaintiffs do not set forth any facts to show they are entitled to relief.  (*Id.*)  Plaintiffs have also filed a motion for jurisdictional discovery related to the non-resident Defendants.  (*See* R.32.)  For the following reasons, the Court grants Defendants' motion to dismiss and denies Plaintiffs' request for jurisdictional discovery.

## BACKGROUND

### I.    The Parties

Plaintiff INDAG is a German corporation with its principal place of business located in Heidelberg, Germany.  (R.1, ¶ 8.)  Plaintiff Wild Parma, an Italian corporation, is a wholly owned subsidiary of INDAG with its principal place of business in Collechio, Italy.  (*Id.*, ¶ 9.)

Defendant IMA S.p.A. is an Italian corporation with its principal place of business located in Bologna, Italy.  (*Id.*, ¶ 10.)  The remaining Defendants are all subsidiaries of IMA S.p.A.:  IMA North America, IMA Industries, and IMA Industries North America as wholly owned U.S. subsidiaries and Fillshape as an Italian subsidiary.  (*Id.*, ¶¶ 11-14.)  IMA Industries is an Illinois corporation with its principal place of business in Mundelein, Illinois.  (*Id.*, ¶ 12.)  IMA North America is a Connecticut corporation with its principal place of business in

Leominster, Massachusetts.  (*Id.*, ¶ 11.)  IMA Industries North America is a Massachusetts corporation with its principal place of business in Leominster, Massachusetts.  (*Id.*, ¶ 13.) FillShape is an Italian corporation with its principal place of business in Bologna, Italy.  (*Id.*, ¶ 14.)

## II.   Facts Alleged

### A.   Plaintiffs' Products & the '017 Patent

Plaintiffs have been in the business of developing pouch technology for over 35 years. (R.1, ¶¶ 4, 23.)  Spouted pouch technology has been in development since 2002 and over the years, Plaintiffs have worked in the design and construction of pouch making and filling machines to increase efficiency.  (*Id.*, ¶ 23.)  Pouch welding and filling machinery can be used to fill a beverage pouch with liquid, e.g., fruit flavored beverages.  (*Id.*, ¶ 22.)  A machine will, for example, first weld spouts and pouches and then sterilize and fill the pouch with product.  (*Id.*) INDAG is the owner by assignment of all right, title, and interests in U.S. Patent No. 7,648,017 ("the '017 Patent"), entitled "Apparatus and Method for Feeding Pouches and Spouts for Processing".  (*Id.*, ¶¶ 1, 43.)  The United States Patent and Trademark Office ("PTO") issued the '017 Patent on January 19, 2010.  (*Id.*, ¶ 43; *see* R.1-1, the '017 Patent, attached to Compl. as Ex. A.)  The '017 Patent is directed to technology related to continuously feeding pouches and spouts to a pouch processing machine.  Claim 1, for example, is directed to a system comprised of a transfer assembly that can simultaneously transfer a spout and pouch to an apparatus.  (R.1, ¶ 44.)

Plaintiffs develop, sell, and license pouch making and filling machinery, including hot filing machinery and aseptic cold filling machinery.  (R.1, ¶ 4.)  Plaintiffs have developed numerous systems and have patented certain aspects of their machinery, while keeping other

proprietary aspects as trade secrets.  (*Id.*, ¶ 5.)  Plaintiffs' methods for aseptic filling and capping, construction of welding grippers and the pouch portioning unit are examples of the types of information Plaintiffs allege they keep confidential or as trade secrets.  (*Id.*, ¶ 22.)  Plaintiffs protect their information by, for example, including warnings on their drawings against unauthorized third-party use, physically surrounding their property with fencing and natural barriers, placing signs indicating authorized access only on their building, using an installed alarm and camera systems, and requiring visitors to be buzzed in through multiple doors.  (*Id.*, ¶ 55.)  Plaintiffs also restrict computer network access through requiring passwords, and all licensees of Plaintiffs' trade secrets sign confidentiality agreements.  (*Id.*)

### B.  The Alleged Misappropriation & Defendants' Products

Plaintiffs hired Mr. Filippo Furlotti in November 2007 to develop spouted pouch making and filling technology at Wild Parma.  (R.1, ¶ 24.)  While at Wild Parma, Mr. Furlotti also worked on aseptic spouted pouch making and filling technology and had access to confidential drawings of Plaintiffs' machines, schematics of the individual machinery parts, and the identity of vendors and suppliers.  (*Id.*, ¶¶ 24, 25.)  Mr. Furlotti also worked, from time to time, on various packaging technology for INDAG, who in turn provided drawings to Mr. Furlotti related to its machines.  (*Id.*, ¶ 24.)  Plaintiffs allege that Mr. Furlotti met with Defendants and Defendants' subsidiaries multiple times beginning as early as April 2012.  (*Id.*, ¶ 26.)  In August 2013, Mr. Furlotti gave notice to Wild Parma of his resignation and negotiated for an expedited termination of his employment effective September 24, 2013.  (*Id.*, ¶¶ 24, 27.)  In October 2013, Mr. Furlotti began working for FillShape.  (*Id.*)

Plaintiffs allege that Defendants hired Mr. Furlotti to develop a competing machine. (R.1, ¶ 6.)  Plaintiffs further allege that prior to joining Defendants, Mr. Furlotti devised a

scheme to steal and exploit Plaintiffs' confidential and trade secret information and misappropriated such information for use in developing competing pouch making and filling machines for Defendants.  (*Id.*, ¶¶ 6, 25.)  Plaintiffs also allege that Defendants' employees entered the Wild Parma facility, at night, with Mr. Furlotti to see how the machinery operated. (*Id.*, ¶ 26.)

According to the Italian Register of Companies, FillShape was incorporated in February of 2013, but remained dormant until November 2013.  (*Id.*, ¶ 28.)  After Mr. Furlotti's arrival, FillShape began marketing filling machines that compete with Plaintiffs' machines.  (*Id.*) FillShape and IMA distributed a flyer dated September 2013 that highlighted an aseptic pouch-filling solution.  (*Id.*; R.1-1, attached to Compl. as Ex. B, IMA-FillShape Spouted Pouches Flyer (the "Flyer").)  According to Plaintiffs, this timing raises suspicions because it can take over 10 years to develop pouch filling machinery, and prior to September 2013, FillShape was not in the business of making, using or selling aseptic pouch filling machines.  (R.1, ¶ 28.)

### C.    Plaintiffs' Investigation of Defendants' Products

In July 2014, Plaintiffs learned that FillShape may be offering for sale competitive hot filling and aseptic cold filling machinery.  (R.1, ¶ 29.)  Plaintiffs responded and began an investigation to determine if Mr. Furlotti and Defendants misappropriated any of Plaintiffs' technology and/or utilized INDAG's patented technology in the design of Defendants' hot filling machine and aseptic cold filling machine.  (*Id.*)  During the investigation, Plaintiffs learned that on multiple occasions shortly prior to Mr. Furlotti's resignation, he copied over 25,000 electronic files onto an external hard drive without permission.  (*Id.*, ¶ 30.)  The copied files include Plaintiffs' drawings and schematics and the identification of vendors that supply components for Plaintiffs' pouch making and filling technology.  (*Id.*)  Mr. Furlotti copied, for example,

technical schematics of a gripper and linear filler portion of a pouch filling machinery.  (*Id.*, ¶ 32.)   In addition, Mr. Furlotti and Defendants contracted with Plaintiffs' vendors to construct their parts—vendors who Plaintiffs endeavored to keep their identity confidential and proprietary.  (*Id.*, ¶ 33.)  Plaintiffs allege that Mr. Furlotti took the external hard drive with him when he left Wild Parma and—with Defendants' knowledge—has used and will continue to use the information during the course of his employment at FillShape to make a competing machine. (*Id.*, ¶¶ 31, 32.)  A forensic analysis of the Wild Parma laptop assigned to Mr. Furlotti showed that it had been wiped clean by a specialized cleaning software prior to Mr. Furlotti's departure. (*Id.*, ¶ 35.)  The laptop of Mr. Furlotti's assistant, Maria Francesca Iacci (who is also now employed at FillShape), had the same wiping software used on it.  (*Id.*)

As of the filing of the Complaint on June 5, 2015, Defendants have not yet completed building a machine.  (R.1, ¶ 34.)  Plaintiffs' investigation revealed, however, that Defendants have had certain parts of their machine built, including an apparatus for loading empty pouches onto a transfer wheel that later feeds the pouches to the spout welding rotor.  (*Id.*)  Plaintiffs allege that an examination of the parts for Defendants' machine will show that Defendants' misappropriated other technology including, but not limited to, the method of filling a pouch aseptically, using a brushless operated gripper in the welding carousel unit, and the design and construction of the pouch portioning unit.  (*Id.*)  Plaintiffs further allege that Defendants' pouch making and filling machine includes a transfer wheel and corresponding machinery that meets each limitation of at least Claim 1 of the '017 Patent.  (*Id.*, ¶ 45.)

### D.     The Pack-Expo International Trade Show

In early November 2014, Defendants IMA and FillShape attended Pack-Expo International Trade Show ("Pack-Expo trade show") represented by Mr. Bianchi.  (R.1, ¶ 36.)

Plaintiffs allege that Defendants—through Mr. Bianchi—attended the Pack-Expo trade show for the purpose of marketing their pouch making and filling technology, including but not limited to, hot filling machinery and aseptic machinery, to customers in the United States. (*Id.*, ¶¶ 36, 37.) At the Pack-Expo trade show, according to Plaintiffs, Mr. Bianchi referred to taking Plaintiffs' employees and building a team to develop a competing product, stating:

> This technology was not offered to the market, it was used basically by one big player, that kept this technology for themselves. They have for ten years the competitive advantage of using this technology and not delivering to competitors. What we did, we took some people from this company, we build up a new team, we design and we improve also this machine, some new concept with the background that we have …

(*Id.*, ¶¶ 38, 39.) Defendants' marketing materials and information from the Pack-Expo trade show, described Defendants' aseptic filling machines and hot filling machines—machines that Plaintiffs allege use the technology of the '017 Patent and the technology Mr. Furlotti knows and took from Plaintiffs. (*Id.*, ¶ 40.) Although Defendants have not completed any sales of the aseptic filling machine in the United States, Plaintiffs allege they are actively seeking customers in the United States. (*Id.*, ¶ 41.)

## III.    Non-Resident Defendants' Contacts with Illinois

Defendants moved for dismissal for lack of personal jurisdiction of non-resident Defendants and did not move to dismiss Defendant IMA Industries on that basis. (*See* R.24; R.25, at 5-14.) Accordingly, for the purposes of its jurisdictional analysis, the Court limits its discussion of Defendants' contacts to the non-resident Defendants. (*See id.*; R.1, ¶¶ 10, 11, 13, 14.) In determining the non-resident Defendants' contacts, the Court accepts as true all Plaintiffs' well-pled factual allegations relating to those contacts and draws all reasonable inferences in Plaintiffs' favor. *See Pennington Seed, Inc. v. Produce Exch. No. 299*, 457 F.3d 1334, 1338 (Fed. Cir. 2006). In support of their motion to dismiss, Defendants submitted three

declarations: (1) the declaration of Mr. Bianchi, the Sales Director for FillShape at the time of the Pack-Expo trade show and currently Executive Vice President of IMA, S.p.A. and a Director of IMA Industries North America (R.25-1, Ex. 1, Bianchi Decl., ¶ 2); (2) the declaration of Mr. Marco Grassilli, Director of FillShape and Director of IMA Industries North America (R.25-2, Ex. 2, Grassilli Decl., ¶ 2); and (3) the declaration of Mr. Sergio Marzo, Assistant Vice President of IMA North America and Director of FillShape (R.25-3, Ex. 3, Marzo Decl., ¶ 2).

Collectively, the declarants state for all non-resident Defendants (Mr. Bianchi for IMA S.p.A., Mr. Grassilli for IMA Industries North America and FillShape, and Mr. Marzo for IMA North America) that their respective companies:

(1) have no offices or manufacturing facilities in Illinois;

(2) do not manufacture anything in Illinois;

(3) do not own any real property or other assets located in Illinois;

(4) have no bank accounts in Illinois;

(5) pay no Illinois income taxes;

(6) have no telephone number, telephone listings, or mailing address in Illinois; and

(7) have no registered agent for service of process in Illinois.

(*See* R.25-1, ¶ 4; R.25-2, ¶ 5; R.25-3, ¶ 5.)

According to Mr. Bianchi, the Pack-Expo trade show encompassed a wide variety of industrial packaging and processing machinery in addition to the filling machinery at dispute in this case.  (R.25-1, ¶ 7.)  Mr. Bianchi further attests that IMA Industries' trade show booth displayed brochures generally describing FillShape's background and expertise in pouch processing machinery and a video showing a 3D rendering of a prototype of what FillShape's machinery—not yet built—might look like when completed.  (R.25-1, ¶ 6.)  Mr. Bianchi attests

that no Defendant provided price quotes for pouch filling machinery to any visitors or potential

customers at the Pack-Expo trade show.  (*Id.*, ¶ 6.)  Mr. Bianchi further explains that price quotes

for or sales of pouch filling machinery are not provided prior to detailed discussions with

potential customers about their particular requirements for the machinery.  (*Id.*, ¶ 8.)  Such

detailed discussions, according to Mr. Bianchi, include whether the machinery is suitable for the

customer's intended application, as well as extensive negotiations regarding terms that will

impact pricing, such as customization, delivery, maintenance, and support.  (*Id.*)  Mr. Bianchi

further states that between the Pack-Expo and the filing of the Complaint, none of the

Defendants provided any price quotes for pouch filling machinery to any potential customers in

Illinois.  (*Id.*, ¶ 6.)

Plaintiffs do not dispute the lack of contacts identified by Defendants' declarants and

listed above, and instead primarily rely on Defendants' contact with Illinois through the

Pack-Expo trade show.  In further support of their position and in response to Defendants'

declarations, Plaintiffs submitted the declaration of Mr. Joseph Metallo, the CEO of InnerValor,

a corporate investigation and security consulting firm.  (R.33-1, ¶ 1.)  Plaintiffs hired Mr.

Metallo to investigate IMA's pouch filling machinery.  (*Id.*, ¶¶ 1, 2.)  As part of his ongoing

investigation, in early November 2014, Mr. Metallo attended the Pack-Expo trade show and

while there met Mr. Bianchi at IMA North America's booth.[1]  (*Id.*, ¶¶ 4, 7, 36.)  Mr. Bianchi's

business card identified him as Sales Director for IMA Industries, S.r.L., located in Bologna,

Italy.  (R.33-1, ¶ 5; *id.*, Ex. 1.)  Mr. Metallo attests that during their conversation, Mr. Bianchi

represented himself as the Sales Director of "IMA" and indicated that he attended the Pack-Expo

---

[1] Mr. Bianchi's declaration identifies the trade show booth as belonging to "IMA Industries",
whereas Mr. Metallo's declaration identifies the trade show booth as belonging to "IMA North America,
Inc."  (*See* R.25-1, ¶ 6; R.33-1, ¶ 4.)

trade show on behalf of "IMA", that "IMA" has a strong presence in the United States, and that he had background knowledge of the pouch filling machine.  (*Id.*, ¶¶ 6, 8.)  Mr. Metallo and Mr. Bianchi discussed the purchase of filling machines for pouches, including both hot filling machinery and aseptic cold filling machinery.  (*Id.*, ¶ 7.)  Mr. Bianchi represented that a pouch filling machine purchased in the United States would be manufactured in Italy, except for certain parts which are manufactured in the United States.  (*Id.*, ¶ 9.)  Mr. Bianchi represented that the lead time for a hot filling machine would be 6-7 months.  (*Id.*, ¶ 10.)  Mr. Bianchi asked Mr. Metallo what type of juices interested him--low-acid juice or high-acid juice.  (*Id.*, ¶ 11.)  Mr. Bianchi informed Mr. Metallo that his company is the only one in the market that produces aseptic cold filling machines for low-acid fruit.  (*Id.*, ¶ 12.)  According to Mr. Metallo, Mr. Bianchi stated that the lead time on such an aseptic cold filling machine would be 15-16 months, in part because the machine still needed approval from the FDA for use in the United States. (*Id.*, ¶¶ 13, 24.)

Mr. Bianchi represented IMA made its aseptic cold filling machines to comply with FDA regulations for operation in the United States, which has more stringent requirements than European regulations. (R.33-1, ¶ 19.)  In addition, Mr. Bianchi showed Mr. Metallo a presentation demonstrating the complete operation, from start to finish, of a machine for pouches and further explained the operation of an aseptic cold filling machine for pouches.  (*Id.*, ¶¶ 18, 19.)  Mr. Bianchi represented that nine out of ten customers were interested in the aseptic cold filling machines.  (*Id.*, ¶ 24.)  According to Mr. Metallo, Mr. Bianchi represented that "though IMA began producing this technology earlier that year (2014), the technology had been used over the past ten years by one big player, who had kept the technology secret from its competitors, including IMA."  (*Id.*, ¶ 20.)

10

Mr. Metallo asserts that he discussed pricing information with Mr. Bianchi at the Pack-Expo trade show.  (R.33-1, ¶¶ 14-17.)  Namely, Mr. Bianchi represented that purchasing a hot filling machine that operates at a rate of 120 pouches per minute would require "an investment in the range of 1 million euro."  (*Id.*, ¶ 14.)  Mr. Bianchi further represented that an aseptic cold filling machine would require "an investment in the range of 4 million euro."  (*Id.*, ¶¶ 15, 16.)  Mr. Bianchi further attested that the maintenance costs for the machine would range from 4 to 5% of the investment per year and that IMA had begun to introduce a proactive maintenance service, for predicting service before parts actually break down.  (*Id.*, ¶ 17.)  Mr. Bianchi represented that, at that time, although IMA's hot filling machine was a prototype, it had sold a line to be delivered in February 2015 to an Italian company.  (*Id.*, ¶ 21.)  Mr. Bianchi further represented that IMA had ended negotiations with an American company regarding delivery of the first aseptic cold filling machine and that Mr. Bianchi intended to travel to Puerto Rico after the Pack-Expo trade show to finalize the contract for that sale.  (*Id.*, ¶ 22.)

## LEGAL STANDARD

### I.     Rule 12(b)(2)

"[P]ersonal jurisdictional issues in patent infringement cases are reviewed under Federal Circuit law, not regional circuit law." [2] *Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com de Equip. Medico*, 563 F.3d 1285, 1293 (Fed. Cir. 2009).  A motion to dismiss for lack of personal

---

[2] Although Regional circuit law would apply to "procedural matters that are not unique to patent law", *Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558, 1564 (Fed. Cir. 1994), Federal Circuit law controls the question of personal jurisdiction, because "the jurisdictional issue is intimately involved with the substance of the patent laws." *Avocent Huntsville Corp. v. Aten Int'l Co.,* 552 F.3d 1324, 1328 (Fed. Cir. 2008) (quotation omitted). "Where a suit involves both patent and non-patent claims, Federal Circuit law regarding due process also applies to the question of personal jurisdiction on non-patent claims if the resolution of the patent infringement issue will be a significant factor in determining liability under the non-patent claims." *Breckenridge Pharma., Inc. v. Metabolite Labs., Inc.,* 444 F.3d 1356, 1361 (Fed. Cir. 2006) (quotation omitted).

jurisdiction pursuant to Rule 12(b)(2) tests whether a federal court has personal jurisdiction over a defendant.  *See* Fed. R. Civ. P. 12(b)(2); *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1564-65 (Fed. Cir. 1994).  When a court determines a Rule 12(b)(2) motion based on the submission of written materials without holding an evidentiary hearing, as is the case here, the plaintiff must make a "prima facie case for personal jurisdiction."  *Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1345 (Fed. Cir. 2012); *Autogenomics, Inc. v. Oxford Gene Tech., Ltd.,* 566 F.3d 1012, 1017 (Fed. Cir. 2009).  In ruling on a Rule 12(b)(2) motion, courts are not limited to consideration of facts alleged in the complaint, but may also consider affidavits and other written materials in the absence of an evidentiary hearing.  *Autogenomics*, 566 F.3d at 1017; *Avocent Huntsville Corp. v. Aten Int'l Co.,* 552 F.3d 1324, 1328-29 (Fed. Cir. 2008).  In doing so, courts must construe the pleadings and affidavits in the light most favorable to the plaintiff.  *Avocent*, 552 F.3d at 1329 (*citing Elecs. for Imaging, Inc. v. Coyle,* 340 F.3d 1344, 1329 (Fed. Cir. 2003)).

## II.     Rule 12(b)(6)

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted."  *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014).  Under Rule 12(b)(6), a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007).  Put differently, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.   Under Rule 8(a)(2), a complaint must include "a

short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement under Rule 8(a)(2) must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly,* 550 U.S. at 555 (citation omitted). A district court's analysis under Rule 12(b)(6) "rests on the complaint, and [the court] construe[s] it in the light most favorable to the plaintiffs, accepting as true all well-pleaded facts alleged and drawing all permissible inferences in their favor." *Fortres Grand Corp. v. Warner Bros. Entm't Inc.*, 763 F.3d 696, 700 (7th Cir. 2014); *see also Teamsters Local Union No. 705 v. Burlington N. Santa Fe, LLC,* 741 F.3d 819, 823 (7th Cir. 2014); *Alam v. Miller Brewing Co.*, 709 F.3d 662, 665–66 (7th Cir. 2013).

When ruling on a Rule 12(b)(6) motion, a court generally may consider only the plaintiff's complaint. *Burke v. 401 N. Wabash Venture, LLC*, 714 F.3d 501, 505 (7th Cir. 2013) (*citing Rosenblum v. Travelbyus.com Ltd.,* 299 F.3d 657, 661 (7th Cir. 2002)). Rule 10(c) provides, however, that "[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." Fed. R. Civ. P. 10(c). When a party attaches certain documents to a motion to dismiss, the court must either convert the Rule 12(b)(6) motion into a motion for summary judgment under Rule 56, or exclude the documents attached to the motion to dismiss and continue under Rule 12. *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002) (*citing Levenstein v. Salafsky,* 164 F.3d 345, 347 (7th Cir. 1998)); *see also* Fed. R. Civ. P. 12(d); *Covington v. Illinois Security Service, Inc.,* 269 F.3d 863, 865 (7th Cir. 2001) ("Although we have at times allowed the conversion of a motion to dismiss into one for summary judgment to be implicit, reversal of such a ruling may become necessary if the district court has not provided the adversely affected party with notice and an opportunity to respond").

A court may consider documents attached to a motion to dismiss, however, if they are referred to in the plaintiff's complaint and if they are central to the plaintiff's claim. *Burke*, 714 F.3d at 505 (*citing McCready v. eBay, Inc.,* 453 F.3d 882, 891 (7th Cir. 2006)). In considering these documents, the court "is not bound to accept the pleader's allegations as to the effect of the exhibit, but can independently examine the document and form its own conclusions as to the proper construction and meaning to be given the material. *Id.* (*citing Rosenblum*, 299 F.3d at 661). Because the Court is faced with challenges to the Complaint under Rule 12(b)(2) and 12(b)(6), it considers both Defendants' and Plaintiffs' declarations and exhibits for jurisdictional purposes, but does not consider them in the context of the Rule 12(b)(6) challenge as they are neither referred to in Plaintiffs' Complaint nor are they central to Plaintiffs' claims. *See Burke*, 714 F.3d at 505.

## ANALYSIS

Plaintiffs allege a claim for patent infringement against all Defendants, arising under federal law (*see* R.1, ¶¶ 42-49, Count I), and a violation of the ITSA, arising under state law (*id.*, ¶¶ 50-60, Count II). In the alternative to their state law claim, Plaintiffs allege misappropriation of trade secrets under the Italian Industrial Property Rights Code. (*Id.*, ¶¶ 61-63, Count III.)[3] Before the Court is Defendants' motion to dismiss brought pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). Specifically, Defendants contend that due process precludes the exercise of personal jurisdiction over the non-resident Defendants and that Plaintiffs fail to

---

[3] The Court's subject matter jurisdiction for patent infringement rests on a federal question: 28 U.S.C. § 1331, conferring original jurisdiction to federal district courts over "all civil actions arising under the Constitution, laws, or treaties of the United States;" and 28 U.S.C. § 1338, stating that U.S. district courts possess subject matter jurisdiction over civil actions that "aris[e] under any Act of Congress relating to patents." *See Touchcom, Inc. v. Bereskin & Parr*, 574 F.3d 1403, 1412-13 (Fed. Cir. 2009).

state a claim for patent infringement against all Defendants and trade secret misappropriation against IMA Industries.

## I.     Plaintiffs' Have Not Established the Court's Personal Jurisdiction Over Non-Resident Defendants

The determination of personal jurisdiction for an out-of-state defendant requires a two-step inquiry: "whether a forum state's long-arm statute permits service of process and whether assertion of personal jurisdiction violates due process."  *Grober*, 686 F.3d at 1345 (citations omitted).  The Illinois long-arm statute permits its courts to exercise personal jurisdiction "on any . . . basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States."  *See* 735 Ill. Comp. Stat. § 5/2–209(c).  Because there is "no operative difference between those two constitutional limits", the Illinois and federal due process inquiry collapses into "whether jurisdiction comports with due process."  *See Mobile Anesthesiologists Chi., LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 443 (7th Cir. 2010); *see also Kipp v. Ski Enter. Corp. of Wisconsin, Inc.,* 783 F.3d 695, 697 (7th Cir. 2015) ("The governing statute in Illinois permits its courts to exercise personal jurisdiction up to the limits of the Due Process Clause of the Fourteenth Amendment").  "Courts may exercise personal jurisdiction over defendants on either of two bases—general or specific jurisdiction." *Touchcom, Inc. v. Bereskin & Parr*, 574 F.3d 1403, 1410 (Fed. Cir. 2009).

### A.     General Jurisdiction

"To establish the minimum contacts necessary to establish general personal jurisdiction, plaintiffs bear a high[] burden."  *Avocent*, 552 F.3d at 1330; *see Daimler AG v. Bauman,* ___U.S. ___, 134 S. Ct. 746, 753, 187 L.Ed.2d 624 (2014)); *Goodyear Dunlop Tires Operations, S.A. v. Brown*, ––– U.S. –––, 131 S. Ct. 2846, 2857, 180 L.Ed.2d 796 (2011).  "General jurisdiction arises when a defendant maintains contacts with the forum state that are sufficiently 'continuous

and systematic' even when the cause of action has no relation to those contacts." *Grober*, 686 F.3d at 1346; *Touchcom*, 574 F.3d at 1410.

The Supreme Court has identified two "paradigm all-purpose forums for general jurisdiction" for a corporation: the state of the corporation's principal place of business or the state of its incorporation. *Daimler,* 134 S.Ct. at 760.  The Supreme Court reasoned that limiting general jurisdiction to only those forums in which a corporation is "at home" allows entities "to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit" while also "afford[ing] plaintiffs recourse to at least one clear and certain forum in which a corporate defendant may be sued on any and all claims." *Id.* at 763 (citations and internal quotation marks omitted).

Absent these circumstances, "[a] court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Id.* at 754, (*quoting Goodyear,* 131 S.Ct. at 2851); *Daimler*, 134 S.Ct. at 761 (explaining that the inquiry "is not whether a foreign corporation's in-forum contacts can be said to be in some sense 'continuous and systematic,' it is whether that corporation's affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State").  In fact, the Supreme Court has made clear, that to "approve the exercise of general jurisdiction in every State in which a corporation engages in a substantial, continuous, and systematic course of business . . . is unacceptably grasping." *Daimler*, 134 S.Ct. at 757 (citations and internal quotation marks omitted).  With this background, the Court turns to the parties' arguments.

Defendants do not challenge personal jurisdiction for IMA Industries, presumably because the paradigms set forth in *Daimler* exist here—IMA Industries is an Illinois corporation with its principal place of business in Illinois.  *See Daimler*, 134 S.Ct. at 760; (R.1, ¶ 18). Defendants do, however, assert that the Court lacks general jurisdiction over the non-resident Defendants.[4]  (R.24.)  In response, Plaintiffs concede that the current facts fail to support a finding of general jurisdiction over three of the four non-resident Defendants—IMA North America, IMA Industries North America, and FillShape, but argue that the Court can exercise specific jurisdiction over three of the four non-resident Defendants, and that under Rule 4(k)(2) can exercise general jurisdiction over Defendant IMA S.p.A.  (*See* R.33, at 11, n.1; *id.*, at 7-11.) The Court addresses each argument in turn.

**B.     The Court Does Not Have General Jurisdiction over IMA S.p.A. Under Rule 4(k)(2)**

Plaintiffs contend that the Court can exercise general jurisdiction over non-resident Defendant IMA S.p.A., a foreign corporation with its principal place of business in Italy, under Federal Rule of Civil Procedure 4(k)(2).  (*Id.*, at 11.)  Defendants reply that the burden on IMA S.p.A. to litigate in Illinois offends due process and that the Court has no significant interest in resolving a dispute between Plaintiffs INDAG (a German company) and Wild Parma (its wholly owned Italian subsidiary), and Defendant IMA S.p.A., an Italian company, relating to events that primarily occurred in Italy.  (R.37, at 8.)

The Federal Circuit has explained that the "analysis of personal jurisdiction in federal court begins with Rule 4 of the Federal Rules of Civil Procedure." *Touchcom*, 574 F.3d at 1410.

---

[4] Defendants rely on Seventh Circuit case law for their arguments related to personal jurisdiction (*see e.g.,* R.25, at 5-10), however, Federal Circuit law governs the personal jurisdiction analysis in patent infringement cases and thus, the Court applies it here.  *See Synthes*, 563 F.3d at 1293.

Rule 4(k)(2), entitled "Federal Claim Outside State-Court Jurisdiction," states in relevant part: "For a claim that arises under federal law, serving a summons … establishes personal jurisdiction over a defendant if: (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws." *Id.* (*citing* Fed. R. Civ. P. 4(k)(2)).  This Rule provides for jurisdiction over a foreign defendant when process has been served and three requirements are met: "(1) the plaintiff's claim arises under federal law, (2) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction, and (3) the exercise of jurisdiction comports with due process." *Id.* (*citing Synthes*, 563 F.3d at 1294).  The Federal Circuit has explained that "Rule 4(k)(2) closed a loophole" whereby "a non-resident defendant who did not have 'minimum contacts' with any individual state sufficient to support exercise of jurisdiction, but did not have sufficient contacts with the United States as a whole, could escape jurisdiction in all fifty states." *Id.* at 1414 (citations omitted).

Rule 4(k)(2) also requires a due process analysis.  *See id.* at 1411-12.  The due process analysis under Rule 4(k)(2), however, slightly differs from the analysis under Rule 4(k)(1)(A) in that Rule 4(k)(2) "contemplate[s] a defendant's contacts with the entire United States, as opposed to the state in which the district court sits." *Id.* at 1416 (citations omitted).  Courts may engage in a Rule 4(k)(2) analysis when "the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible." *Id.* at 1415.

### 1.    Applicability of Rule 4(k)(2)

The Supreme Court has explained that 28 U.S.C. § 1338 jurisdiction extends to any case "in which a well-pleaded complaint establishes either that federal patent law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial

question of federal patent law, in that patent law is a necessary element of one of the well-pleaded complaints." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 809, 108 S. Ct. 2166, 100 L. Ed. 2d 811 (1988).

Here, neither party disputes the first requirement—that INDAG's patent infringement claim arises under federal law. *See* 28 U.S.C. § 1338 (2012). The second requirement of Rule 4(k)(2) is that a defendant is not subject to the jurisdiction of any state's court of general jurisdiction. *Synthes*, 563 F.3d at 1293. For this requirement, the Federal Circuit does not look to where the plaintiff has alleged that a defendant is subject to jurisdiction, rather, if "the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2)." *Touchcom*, 574 F.3d at 1415. The Federal Circuit's reasoning for this rule is that "[r]equiring a plaintiff to certify that a defendant is not subject to jurisdiction in any state forecloses an argument by the plaintiff that the defendant is subject to jurisdiction in the state in which the court resides." *Id.*

Plaintiffs assert that IMA S.p.A. has represented that it cannot be sued in this forum and has not identified another forum where Plaintiffs could have brought suit against it.[5] Indeed, Defendant IMA S.p.A. contends that it is not subject to the personal jurisdiction in Illinois and has not identified any other state where it would be subject to personal jurisdiction. This meets the second element of the Federal Circuit's Rule 4(k)(2) jurisdictional test and the Court therefore engages in a Rule 4(k)(2) analysis. *See Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1294

---

[5] Rule 4(k)(2) does not apply to IMA North America and IMA Industries North America because, as asserted in Plaintiffs' Complaint, they are both subject to general jurisdiction in Massachusetts—IMA North America is a Connecticut corporation with its principal place of business in Leominster, Massachusetts and IMA North America is a Massachusetts corporation with its principal place of business in Leominster, Massachusetts. *See Daimler*, 134 S.Ct. at 760 (identifying two "paradigm all-purpose forums for general jurisdiction" for a corporation: the state of the corporation's principal place of business or the state of its incorporation). Plaintiffs did not argue that Rule 4(k)(2) applies to FillShape and the Court limits its analysis accordingly.

(Fed. Cir. 2012) ("[I]f the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2).".

### 2. IMA S.p.A's Alleged Contacts with the United States Are Insufficient for General Jurisdiction

As previously discussed, "[a] court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Daimler*, 134 S. Ct. at 754. When applied under Rule 4(k)(2), however, a court must consider "defendant's contacts with the entire United States, as opposed to the state in which the district court sits." *Touchcom*, 574 F.3d at 1416. Thus, the inquiry becomes whether a defendant's affiliations with the United States are so 'continuous and systematic' as to render it essentially at home in the United States. *See Synthes*, 563 F.3d at 1297 (explaining that the relevant contacts in the general jurisdiction analysis under Rule 4(k)(2) are with the United States as a whole).

IMA S.p.A. is an Italian corporation with its principal place of business located in Bologna, Italy. (*Id.*) Plaintiffs' allegations as set forth in the Complaint provide that IMA S.p.A.:

1. wholly owns three subsidiaries in the United States;

2. shares at least two board members with its United States subsidiaries;

3. advertises that one of its United States' subsidiaries, IMA Industries North America, is the representative of all IMA Industries for the United States; and

4. identifies that its Illinois subsidiary, IMA Industries, and another United States

subsidiary, IMA Industries North America, market machines manufactured by the

company group and provide the related customer service in their respective territories.

(R.1, ¶ 16.)

These contacts do not meet the high burden of general jurisdiction applicable here because they do not amount to "continuous and systematic" contacts by IMA S.p.A. to render it "essentially at home" in the United States as required by *Daimler*, 134 S. Ct. at 754; *see also Synthes*, 563 F.3d at 1297. A foreign corporation should not be dragged into a United States Court if its only contacts consist of owning a subsidiary in the United States or sharing one or more board members with a United States corporation. *See Daimler*, 134 S.Ct. at 759 (rejecting the exercise of general jurisdiction over foreign corporations based on the presence of an in-state subsidiary or affiliate). Plaintiffs state that "IMA S.p.A. can be 'subject[] to [this] court's general jurisdiction based on the contacts of its in-state subsidiary.'" (*See* R.33, at 12.) The phrase which Plaintiffs borrow from *Daimler*, however, is not the definitive conclusion that Plaintiffs assert, as in full context it states, "[t]his Court has not yet addressed whether a foreign corporation may be subjected to a court's general jurisdiction based on the contacts of its in-state subsidiary." *Daimler*, 134 S.Ct. at 759. Indeed, as the Supreme Court goes on in *Daimler* to analyze the Ninth Circuit's agency test imputing subsidiary contacts on the parent corporation, it finds that employing such a theory "appears to subject foreign corporations to general jurisdiction whenever they have an in-state subsidiary or affiliate, an outcome that would sweep beyond even the 'sprawling view of general jurisdiction' we rejected in *Goodyear*." *Daimler*, 134 S.Ct. at 759-60.

Looking at the present case, Plaintiffs rely on the same type of contacts for IMA S.p.A. as those alleged in *Daimler* to support an agency theory for general jurisdiction that the Supreme Court rejected.  As such, these contacts do not suffice for the purposes of general jurisdiction. Such a broad application of jurisdiction is exactly what the Supreme Court emphasized courts cannot do.  *Daimler*, 134 S.Ct. at 759-60; *see also id.* at *757* ("[To] approve the exercise of general jurisdiction in every State in which a corporation engages in a substantial, continuous, and systematic course of business . . . is unacceptably grasping.")

Lastly, even if the Court considered the trade show contact as imputable to IMA S.p.A., which, as discussed *infra* in Section C.i., it can do when taking the contradictory facts in the light most favorable to Plaintiffs, this fact does not rescue the lack of general jurisdiction.  Mr. Bianchi's presence at the Pack-Expo trade show, alone or in combination with the above contacts with the United States, still fails to establish general jurisdiction.  *See Grober*, 686 F.3d at 1346 ("[Attendance at] trade shows . . . does not rise above a sporadic and insubstantial contact."); *Synthes*, 563 F.3d at 1297 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415-16, 104 S. Ct. 1868, 1872, 80 L. Ed. 2d 404 (1984)) (finding a lack of general jurisdiction where the defendant's contacts with the United States included attendance at trade shows, purchases of parts and a machine, the sale of a product for a veterinary application to one customer, and a pair of consultations about product development).  Accordingly, the Court finds that it does not have general jurisdiction under Rule 4(k)(2) over IMA S.p.A. based on the facts alleged in Plaintiffs' Complaint and the additional evidence provided by the parties in their declarations.  Because Plaintiffs limited their argument to general jurisdiction under Rule 4(k)(2) (*see* R.33, at 11-13), the Court does not analyze whether Defendant IMA S.p.A. is subject to specific jurisdiction under Rule 4(k)(2) which also considers the United States as the forum.

The Court, therefore, turns to whether it has specific jurisdiction over non-resident Defendants IMA S.p.A., IMA North America, IMA Industries North America, and FillShape based on their contacts with Illinois.

### C.   The Court Does Not Have Specific Jurisdiction over Non-Resident Defendants Based on Their Illinois Contacts

The Court's determination of whether a defendant is subject to specific personal jurisdiction in the forum state involves two inquiries: (1) whether the forum state's long-arm statue permits service of process and (2) whether the assertion of jurisdiction is consistent with due process. *Celgard, LLC v. SK Innovation Co.*, 792 F.3d 1371, 1377-78 (Fed. Cir. 2015). This second factor, under the Due Process Clause, constrains the courts' "authority to bind a nonresident defendant to a judgment" unless the nonresident has "certain minimum contacts" with the forum. *Walden v. Fiore*, 134 S. Ct. 1115, 1121, 188 L. Ed. 2d 12 (2014). To determine whether a nonresident defendant has sufficient contacts with the forum for the Court to assert specific jurisdiction over that defendant, the Court must "focus[] on the relationship among the defendant, the forum, and the litigation." *Id.* (internal quotations marks and citations omitted). The Supreme Court has cautioned, that not just any contacts will do: "[f]or a State to exercise jurisdiction consistent with due process, the defendant's *suit-related* conduct must create a substantial connection with the forum State." *Id.* at 1121 (emphasis added). Moreover, contacts with the forum that are "random", "fortuitous," or "attenuated," or that result from the "unilateral activity of another party or third person" are not sufficient to establish personal jurisdiction. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985). The "mere fact that [defendant's] conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction." *Walden*, 134 S. Ct. at 1126. Lastly, the

relationship between the defendant and the forum "must arise out of contacts that the 'defendant *himself* creates with the forum . . . ." *Id.* at 1122 (quoting *Burger King,* 471 U.S. at 475).

Due process also requires that the defendant's "minimum contacts with the forum state" are sufficient, "such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Celgard*, 792 F.3d at 1377 (*citing Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed.95 (1945)).  The Federal Circuit "applies a three-part test to determine whether this due process requirement for specific personal jurisdiction is met by considering: (1) whether the defendant purposefully directed its activities at residents of the forum state, (2) whether the claim arises out of or relates to the defendant's activities with the forum state, and (3) whether assertion of personal jurisdiction is reasonable and fair."  *Celgard*, 792 F.3d at 1377-78 (*citing Grober*, 686 F.3d at 1346); *see also Synthes*, 563 F.3d at 1294.  "The plaintiff bears the burden of affirmatively establishing the first two elements of the due process requirement" and if met, "the burden [then] shifts to the defendant to prove that personal jurisdiction is unreasonable."  *Celgard*, 792 F.3d at 1377-78 (citations omitted).  "The first two factors correspond with the 'minimum contacts' prong" of *International Shoe,* "and the third factor corresponds with the 'fair play and substantial justice' prong."  *Id.* at 1377-78 (*citing Inamed Corp. v. Kuzmak,* 249 F.3d 1356, 1360 (Fed. Cir. 2001)).  Five additional factors are considered in determining the third factor of whether the assertion of personal jurisdiction is reasonable and fair: "(1) the burden on the defendant, (2) the forum's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the states in furthering fundamental substantive policies."  *Synthes*, 563 F.3d at 1299 (citing *Burger King,* 471 U.S. at 477).

### 1.    Plaintiffs Have Failed To Demonstrate that Defendants Purposefully Directed their Activities at Illinois

In order for the Court to exercise specific personal jurisdiction over the non-resident Defendants, Plaintiffs must show, *inter alia*, that Defendants have purposefully directed their activities at Illinois residents.  *See Burger King,* 471 U.S. at 472-73.  Plaintiffs, however, have not satisfied the first prong of the specific jurisdiction test.  *See Celgard*, 792 F.3d at 1377.

Plaintiffs assert that the Court has specific jurisdiction over Defendants because they intentionally availed themselves of the privilege of conducting business in the state of Illinois. (R. 1, ¶¶ 16-20.)  In support of their position, Plaintiffs rely on a single contact and assert that the Court has specific personal jurisdiction over IMA North America and IMA Industries North America because they conducted business within the State of Illinois when appearing at the Pack-Expo trade show in Chicago and promoting and offering for sale products that infringe the '017 patent.[6]  (R. 1, ¶¶ 17, 19.)  Plaintiffs further assert that the Court has specific personal jurisdiction over FillShape "because FillShape was cognizant that its manufactured machines incorporating the patented technology and the misappropriated trade secrets were to be offered for sale in the United States" through the marketing companies of IMA S.p.A.—IMA North America and IMA Industries.  (*Id.*, ¶ 20.)

Plaintiffs rely on Defendants' attendance at the Pack-Expo trade show, but the facts as alleged and provided in declarations do not provide a clear picture of which Defendants actually

---

[6] Although Plaintiffs did not provide any legal support for this basis of personal jurisdiction in their briefing, an act of patent infringement satisfies § 2–209(a)(2) of the Illinois long-arm statute because it is well-established that infringement of a patent constitutes tortious activity.  *See Fluid Mgmt. Ltd. P'ship v. H.E.R.O. Indus., Ltd.*, No. 95 C 5604, 1997 WL 112839, at *3 (N.D. Ill. Mar. 11, 1997); *see also Bingo Brain, Inc. v. California Concepts, Inc.*, No. 99C6139, 2000 WL 690227, at *6 (N.D. Ill. May 24, 2000).

attended the trade show.  In early November of 2014, Mr. Bianchi attended the Pack-Expo in

Chicago, Illinois.  (R. 1, ¶ 36.)  The parties provide conflicting factual evidence as to who Mr.

Bianchi represented while at the trade show.  In Defendants' declaration, Mr. Bianchi attests that

at the time of the trade show, he was the Sales Director for FillShape (an Italian corporation),

and that he currently serves as the Executive Vice President of IMA S.p.A. (an Italian

corporation), and a Director of IMA Industries North America (a Massachusetts Corporation).

(R. 25-1, ¶ 2.)  Mr. Bianchi further attests that "IMA Industries" trade show booth displayed

FillShape's promotional materials prototype video.  (*Id.*, ¶ 5.)  It is not entirely clear if Mr.

Bianchi meant IMA Industries (Illinois Corporation) or IMA Industries North America

(Massachusetts Corporation).  (*Id.*, ¶ 5.)  Plaintiffs respond and assert in the Metallo Declaration

that Mr. Metallo understood Mr. Bianchi as representing and supporting sales on behalf of the

IMA Defendants.  (R.33-1, ¶ 6.)  Mr. Metallo's declaration further asserted the involvement of

another, unnamed party listed on Mr. Bianchi's business card—IMA Industries, S.r.l.  (R.33-1,

¶ 5; *see id.*, Ex. 1.)  The business card attached to the Metallo Declaration states "IMA

Industries" on the top and lists Mr. Bianchi as "Sales Director" with an email address

@ima-industries.com.  (R.33-1, Ex.1.)  The business card also provides two addresses.  The first

address listed on the front of the card is for "IMA Industries S.r.l." and states: 40069 Zola

Predosa, (Bologna) Italy.  (*Id.*)  This address is the same as that listed in Plaintiffs' Complaint for

FillShape.  (*See* R.1, ¶ 14.)  The second address listed on the back of the card is for "IMA

Industries S.r.l. Unipersonale (*Registered Office*)" and states: 40064 Ozzano dell'Emilia

(Bologna) Italy.  (R.33-1, Ex.1.)  This address is the same as that listed in Plaintiffs' Complaint

for Ima S.p.A.  (*See* R.1, ¶ 10.)  Construing the evidence from the pleadings and affidavits in the

light most favorable to Plaintiffs, it is reasonable to infer that Mr. Bianchi's presence at the

Pack-Expo trade show was on behalf of all Defendants. *See Avocent*, 552 F.3d at 1329

(explaining that for a Rule 12(b)(2) motion, the court must construe the pleadings and affidavits

in the light most favorable to the plaintiff). *Avocent*, 552 F.3d at 1329; *see also Pennington*, 457

F.3d at 1338.

Treating the trade show contact as Defendants' contact, however, does not end the

inquiry. The Court must determine whether that contact, alone is sufficient to demonstrate

purposeful availment. The Federal Circuit has addressed a trade show contact for the purposes

of specific jurisdiction. *See Synthes*, 563 F.3d at 1297-99; *Patent Rights Prot. Grp., LLC. v.*

*Video Gaming Techs., Inc.*, 603 F.3d 1364, 1369-70 (Fed. Cir. 2010); *Med. Solutions, Inc. v. C*

*Change Surgical, LLC.*, 541 F.3d 1136, 1140-41 (Fed. Cir. 2008).

In *Synthes,* the Federal Circuit found it had personal jurisdiction over a Brazilian

defendant that had appeared at a single trade show in the forum state. 563 F.3d at 1298. It did

so, however, in the context of a Rule 4(k)(2) analysis, which required that it consider a

defendant's contacts with the nation as a whole. *Id.* at 1296. The same defendant had attended

six other tradeshows elsewhere in the United States. *Id.* at 1291. On that basis, the court found

that attendance at a single trade show in the forum state, in addition to six other tradeshow

attendances in the United States together and other deliberate contacts with the United States,

constituted sufficient contacts to establish that the Brazilian defendant purposely availed itself of

the United States. *Id.* at 1298; *see also Patent Rights,* 603 F.3d at 1370 (finding the exercise of

specific jurisdiction fair and not particularly onerous where the defendants admitted presence at

numerous trade shows in the forum state). On the other hand, in *Medical Solutions*, the Federal

Circuit expressly considered the plaintiff's assertion that the defendants attendance at a trade

show in the forum state where it displayed prototypes of the allegedly infringing product, staffed

its booth with representatives, and made product brochures available constituted a "use" under 35 U.S.C. § 271(a) that conferred personal jurisdiction.  541 F.3d at 1140-41.  The Federal Circuit rejected the plaintiff's argument, however, and affirmed the district court's ruling that the trade show activities did not constitute a "use" of the allegedly infringing product rendering the plaintiff's prima facie case of jurisdiction unsupported.  *Id.*

As established by the Federal Circuit, a single attendance at a trade show is not, alone, sufficient to support a prima facie case of personal jurisdiction.  Indeed, at least one district court has distinguished *Synthes* on this very basis.  *See e.g., Gro Master, Inc. v. Farmweld, Inc.*, 920 F.Supp.2d 974, 982 (N.D. Iowa. 2013) (distinguishing *Synthes* for its multiple trade show contacts with the United States and finding a single trade show appearance in the forum state insufficient to support specific jurisdiction because it "is merely an insubstantial contact with the forum").  Indeed, *Synthes* "does not stand for the proposition that a single appearance at a trade show is sufficient to establish the minimum contacts required for the proper exercise of 'specific' personal jurisdiction."  *Id.*

Applying this background, it becomes apparent that Defendants' single attendance—via Mr. Bianchi—at the Pack Expo trade show does not establish specific personal jurisdiction.  Moreover, the trade show is the only contact Plaintiffs allege Defendants have with Illinois.  Thus, Defendants' attendance at the Pack Expo—displaying promotional materials, describing FillShape's background and expertise in the industry, and showing a prototype video, without more, fails to establish that Defendants purposefully directed their activities toward the residents of Illinois.

### 2.   Plaintiffs Have Failed to Establish that Their Claims of Infringement and Misappropriation Arose out of or Relate to Defendants' Alleged Infringement at the Pack-Expo Trade Show

Given that Defendants' trade show attendance alone is insufficient to establish purposeful direction, the Court's specific jurisdictional inquiry could end here.  Even if Defendants' trade show attendance were enough, however, Plaintiffs have not shown that the factual basis of the alleged claims of patent infringement and trade secret misappropriation relates to Defendants' trade show activities.  *See Celgard*, 792 F.3d at 1377-78 (explaining the second required prong of the specific jurisdiction test of whether the claim arises out of or relates to the defendant's activities with the forum state).  Specifically, Plaintiffs factual basis demonstrating Mr. Bianchi's conduct related to an alleged "offer for sale" of an allegedly infringing machine under 35 U.S.C. § 271(a) is insufficient to confer specific jurisdiction under the second prong of the specific jurisdictional test.  *See 3D Sys., Inc. v. Aarotech Labs, Inc.*, 160 F.3d 1373, 1378-79 (Fed. Cir. 1998) (analyzing an alleged offer for sale to determine whether it supports the second prong of the specific jurisdictional test).

Patent infringement occurs when an accused infringer "without authority makes, uses, offers to sell or sells any patented invention."  35 U.S.C. § 271(a).  Accordingly, in order for the Court to exercise specific jurisdiction over Defendants, Plaintiffs must sufficiently allege that Defendants did one of these listed activities.  Here, Plaintiffs allege that Defendants engaged in an offer to sell at the Pack-Expo trade show.  The Federal Circuit has defined liability for an "offer to sell" under Section 271(a) "according to the norms of traditional contractual analysis." *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1376 (Fed. Cir. 2005) (citing *Rotec Indus., Inc. v. Mitsubishi Corp.,* 215 F.3d 1246, 1254-55 (Fed. Cir. 2000)).  According to the Federal Circuit, in order to qualify as an "offer to sell" under Section

271(a), a defendant must "communicate[ ] a 'manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.'" *Id.* (quoting Restatement (Second) of Contracts § 24 (1979)).  To constitute an "offer to sell" under traditional contract principles, an offer requires a definite price term, otherwise the offeree could make the offer into a binding contract by a simple acceptance.  *See id.* (*citing Rotec Indus.,* 215 F.3d at 1251) ("[T]he e-mails, while containing a description of the allegedly infringing wafers, do not contain any price terms.  Accordingly, on their face, the e-mails cannot be construed as an 'offer' which [the defendant's customer] could make into a binding contract by simple acceptance.").

The Federal Circuit provided further guidance as to what constitutes an offer for sale in In *3D Systems*, the Federal Circuit determined that the price quotation letters constituted an "offer to sell" since they contained a specific description of the accused product and the price at which it could be purchased.  160 F.3d at 1379.  In *HollyAnne Corp. v. TFT, Inc.,* the Federal Circuit noted in dicta that under Section 271(a) an offer to sell contains "the hallmarks of a potential commercial transaction. (i.e., a quotation of price and a product description, or a communication that the item was available for purchase by the intended donee)."  199 F.3d 1304, 1309-10 (Fed. Cir. 1999)   Thus, Federal Circuit law makes it clear that an "offer to sell" under Section 271 requires both a description of the product and a fixed price term.

According to the Metallo Declaration, Mr. Bianchi provided estimated prices at the Pack-Expo trade show stating that purchasing a hot filling machine required "an investment in the range of 1 million euro" while purchasing an aseptic cold filling machine required "an investment in the range of 4 million euro".  (R. 33-1, ¶¶ 14, 15; *see also id.*, ¶ 16 (explaining that a cold filling machine for rigid containers required an investment of "about 4 million euro").)

Given the clear direction under Federal Circuit law, these verbal price estimates cannot reasonably be construed as an offer for which Mr. Bianchi understood to invite Mr. Metallo's assent to the terms and if given, would *conclude* the bargain.  *See MEMC*, 420 F.3d at 1376 (explaining that an "offer to sell" must "communicate[] a 'manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will *conclude* it") (emphasis added).

Plaintiffs further argue that according to the norms of the industry an "offer to sell" may occur in certain circumstances without a price term.  In support of their argument, Plaintiffs cite Mr. Bianchi's declaration wherein he states: "[p]rice quotes for pouch filling machinery are not provided prior to, and sales of pouch filling machinery are preceded by, detailed discussions with potential customers about their particular requirements for machinery (including whether the machinery is suitable for the customer's intended application), as well as extensive negotiation regarding terms that will impact price, such as customization, delivery, maintenance, and support."  (R. 25-1, ¶ 8.)  Plaintiffs argue that in such a situation, an offer for sale may occur without a price term.

The Court disagrees.  Even taken in the light most favorable to Plaintiffs, the situation described by Mr. Bianchi does not support the position Plaintiffs assert.  Instead, the reasonable inference from Mr. Bianchi's statement suggests that until Defendants engage in detailed discussions with potential customers, any preceding discussions lacking a complete description of the appropriate product for the customer's use are incapable of expressing the willingness to enter into a bargain.  *See MEMC*, 420 F.3d at 1376.  Here, Mr. Bianchi and Mr. Metallo did not discuss any of the specific details about the product being sold and failed to identify a definite price term.   Notably, it is undisputed that Defendants had not yet built a filling machine at the

time of the trade show.  (*See* R.25-1, ¶ 6.)  Plaintiffs also do not dispute that the trade show video showed only a prototype.  (*Id.*, ¶ 5.)  Given these facts, a proposed loose agreement between the parties that did not contain specific disclosure of a product or a price falls short of what Federal Circuit law requires.  As such, Plaintiffs have failed to establish that Defendants' conduct at the trade show constituted an "offer to sell" under Section 271(a) for jurisdictional purposes.[7]  *See 3D Sys.,* 160 F.3d at 1379.  The result of Plaintiffs' inability to satisfy this showing renders the second prong of the specific jurisdictional analysis unmet.

Because Mr. Bianchi provided neither a definite price term nor a detailed description of a machine that allegedly infringed Plaintiff INDAG's patent, there could not have been an offer to sell its product for the jurisdictional purposes of 35 U.S.C. § 271(a).  *See MEMC*, 420 F.3d at1376; *see also HollyAnne,* 199 F.3d at 1308–09 ("[T]here had been an 'offer to sell' where the defendant manufacturer had communicated to prospective buyers both a description of the product and 'a price at which it can be purchased'").  Thus, because Plaintiffs have failed to allege that Defendants committed the tort of patent infringement by Mr. Bianchi's conduct at the Pack-Expo trade show, Plaintiffs have failed to make a *prima facie* showing of personal jurisdiction through their "offer to sell" argument.

Because Plaintiffs are unable to satisfy either of the prongs of the specific jurisdictional test for which they have the burden, the Court finds that it cannot exercise specific personal jurisdiction over Defendants in the present action.[8]

---

[7] Defendants further assert that the Uniform Commercial Code would require an agreement for the sale of a pouch filling machinery to be in writing.  "[A] contract for the sale of goods for the price of $500 or more is not enforceable . . . unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought."  U.C.C. § 2-201 (2002).  Given that Mr. Bianchi's estimates were in the millions of euros, it seems less plausible that such a significant transaction—if governed by the U.C.C. would be conducted verbally.

[8] Because the Court finds the first and second prong of the specific jurisdiction analysis not met here, it does not need to consider whether Defendants met their burden to establish the third prong.  *See*

**II.      Plaintiffs Fail to State a Claim for Patent Infringement Under Rule 12(b)(6)**

Because the parties do not dispute the Court's exercise of personal jurisdiction over Defendant IMA Industries, an Illinois resident, the Court proceeds to an analysis of Defendants' motion to dismiss on the basis of Rule 12(b)(6).

In ruling on Defendants' Rule 12(b)(6) motion, the Court considers only the Complaint and its attached exhibits as the submitted declarations and declarants are not referred to in Plaintiffs' Complaint and are not central to the Plaintiffs' claims.  *See Levenstein,* 164 F.3d at 347.  As such, given that Plaintiffs did not sufficiently plead that Defendants' conduct constituted an "offer for sale" of an allegedly infringing product when the Court considered the additional evidence, the consideration of only Plaintiffs' Complaint leaves Plaintiffs with a pleading hurdle to support the same allegations for the purposes of Rule 12(b)(6).

As the Court discussed at length above, in order to qualify as an "offer to sell" within the meaning of Section 271(a), a defendant must "communicate[ ] a manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it."  *MEMC*, 420 F.3d at 1376 (quotation omitted). Moreover, to constitute an "offer to sell" under traditional contract principles, an offer requires definite price term otherwise the offeree could make the offer into a binding contract by a simple acceptance.  *See id.*

In their Complaint, Plaintiffs allege that in early November 2014, Defendants— represented by Mr. Bianchi—attended the Pack-Expo trade show.  (*See* R.1, ¶ 36.)  Without reference to any price terms or product specifics, Plaintiffs further allege that Mr. Bianchi

---

*Celgard*, 792 F.3d at 1377-78 (citations omitted) ("The plaintiff bears the burden of affirmatively establishing the first two elements of the due process requirement" and if met, "the burden [then] shifts to the defendant to prove that personal jurisdiction is unreasonable").

"offer[ed] for sale hot fill machinery" that incorporated both the trade secrets and patented technology.  (*See* R.1, ¶ 37; *see also id.*, ¶ 34 (alleging that "[o]n information and belief, an examination of parts of Defendants' machine will show that Defendants' misappropriated other technology…").)  Regarding Defendants' product, Plaintiffs allege that Defendants' pouch making and filling machine includes a transfer wheel and corresponding machinery that meets limitations of the '017 Patent claims.  (*See id.*, ¶ 45.)  Plaintiffs also allege, however, that "Defendants have not completed building a machine" and have only built certain parts and that "Defendants have not completed any sales of the aseptic filling machine in the United States, but are actively seeking customers in the United States".  (*See id.*, ¶¶ 34, 41.)

These facts are insufficient to satisfy the pleading standard required for an "offer for sale" under Section 271(a).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.   The allegations provided by Plaintiffs' Complaint fail to provide factual content from which the Court can make a reasonable inference of Defendants' liability under Section 271(a).  Instead, Plaintiffs simply allege that Mr. Bianchi in explaining the history of pouch filling technology stated, "[t]his technology was not offered to the market, it was used basically by one big player. . . .  We took some people from this company, we built up a new team, we design and we improve also this machine, some new concept from the background we have."  (R.1, ¶ 38.)  These allegations do not support an inference that Defendants made an offer for sale at the Pack-Expo trade show.  Attendance at a trade show and displaying a prototype does not, alone, constitute an offer for sale under Section 271(a).  *See MEMC*, 420 F.3d at 1376; *3D Sys.,* 160 F.3d at 1379.

In addition, although Defendants challenge the sufficiency of Plaintiffs' allegations at the pleading stage, Plaintiffs are reminded of the presumption against extraterritorial application of infringement liability under Section 271(a).  *See Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 769 F.3d 1371, 1380 (Fed. Cir. 2014).  Specifically, an alleged offer for sale under Section 271(a) that includes contracting and negotiating activities in the United States, but ultimately results in contemplation of a sale occurring outside the United States is not encompassed by Section 271(a).  *Id.*  To do so would extend "the geographical scope of [Section] 271(a) in effect [and] confer a worldwide exclusive right to a U.S. patent holder, which is contrary to the statute and case law.  *Id.* (*citing Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1371-72 (Fed. Cir. 2013)); *Halo*, 769 F.3d at 1380 (*citing Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 531, 92 S.Ct. 1700, 32 L.Ed.3d 374 (1972)) ("To the degree that the inventor needs protection in markets other than those of this country, the working of 35 U.S.C. §§ 154 and 271 reveals a congressional intent to have him seek it abroad through patents secured in countries where his goods are being used").  Plaintiffs are foreign corporations— INDAG, a German corporation and Wild Parma, an Italian corporation.  (R.1, ¶¶ 8,9.)  As such, the parties' interactions at the International Pack-Expo would not constitute infringement liability of an offer for sale under Section 271(a) if the contemplated sales were to occur outside the United States.  *See Halo*, 769 F.3d at 1381 ("An offer to sell, in order to be an infringement, must be an offer contemplating sale in the United States").  In addition to the deficiencies in Plaintiffs' allegations regarding the specific product description and price, Plaintiffs have not alleged any intended location or customer of the alleged offer for sale, other than to argue that it was a proposed offer for sale to customers that attended the Pack-Expo trade show, an international trade show.  (*See* R.1, ¶ 37.)  Furthermore, Plaintiffs allege that Mr. Bianchi

represented at the trade show that, although IMA's hot filling machine was a prototype, it had

sold a line to be delivered in February 2015 to an *Italian* company.  (*Id.*, ¶ 21 (emphasis added).)

Plaintiffs have further alleged that "Defendants have not completed any sales of the aseptic

filling machine in the United States."  (*Id.*, ¶ 40.)  Taking these facts in the light most favorable

to Plaintiffs, the Court cannot reasonably infer that the allegations are sufficient to state a claim

for patent infringement under Section 271(a).

Accordingly, the Court cannot, without additional facts alleged, find that Plaintiffs

adequately state a claim that Defendants "offered for sale" a machine, which would make them

liable for patent infringement under Section 271(a).  *See Iqbal*, 556 U.S. at 678.  Thus, Plaintiffs'

factual allegations are not "enough to raise a right to relief above the speculative

level." *Twombly,* 550 U.S. at 555.[9]  The Court grants Defendants motion to dismiss in this

regard and dismisses, without prejudice, Count I of Plaintiffs' Complaint as to Defendant IMA

Industries.

### III.     Plaintiffs' Trade Secret Misappropriation Claims

#### A.     Plaintiffs State Claims for Trade Secret Misappropriation Against IMA Industries

Defendants ask the Court to dismiss Counts II and III of Plaintiffs' Complaint as to IMA

Industries for Plaintiffs' failure to state a claim for trade secret misappropriation against IMA

Industries.  Specifically, Defendants argue that Plaintiffs fail to allege that IMA Industries

attended the Pack-Expo trade show, the sole action upon which Plaintiffs rely for their trade

---

[9] The information provided by Plaintiffs' declaration submitted in support of their opposition to Defendants' jurisdictional analysis may provide additional factual bases for the alleged offer for sale as it relates to Defendant IMA Industries.  The Court's analysis under Rule 12(b)(6), however, does not consider the declaration (*see supra*, Legal Standard, Section II).  *See e.g., 188 LLC*, 300 F.3d at 735; *see also Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreens Co.,* 631 F.3d 436, 448 (7th Cir. 2011) (the "rule that a plaintiff may not amend his complaint in his response brief" is "axiomatic"); *Friello v. Bank of New York*, No. 12 C 03270, 2012 WL4892856, at *9 (N.D. Ill. Oct. 5, 2012).

secret misappropriation claim.  Although Plaintiffs' Complaint does not allege IMA Industries attended the trade show in the paragraph cited by Defendants (*see* R.1, ¶ 16), it contains an additional paragraph in the factual background that states that all Defendants attended the trade show (*see id.*, ¶¶ 2, 36).  This allegation is not an inconsistency in Plaintiffs' Complaint, as a simple review of the pleading makes clear that the paragraph cited by Defendants (*see* R.1, ¶ 16), sits under the heading of "JURISDICTION AND VENUE" and Plaintiffs do not rely on the trade show attendance as a jurisdictional contact for IMA Industries.  Indeed, IMA Industries is the one Defendant that both parties agree is subject to general jurisdiction in Illinois.  Accordingly, the Court denies Defendants' motion to dismiss regarding Counts II and III of Plaintiffs' Complaint as to IMA Industries.

### B.  Supplemental Jurisdiction Over Trade Secret Misappropriation Claims

Plaintiffs' trade secret misappropriation claim as to both IMA Industries and non-resident Defendants, however, still runs into difficulty.  Federal courts have an independent obligation to ensure that subject matter jurisdiction exists.  *See e.g., Wild v. Subscription Plus, Inc.*, 292 F.3d 526 (7th Cir. 2002).  The Federal Circuit has stated that 28 U.S.C. § 1367 "is a broad grant of supplemental jurisdiction over other claims within the same case or controversy, as long as the action is one in which the district courts would have original jurisdiction."  *Voda*, 476 F.3d at 893 (Fed. Cir. 2007) (citing *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 557, 125 S. Ct. 2611, 2620, 162 L. Ed. 2d 502 (2005)); *see also Copeland v. Penske Logistics LLC,* 675 F.3d 1040, 1043 (7th Cir. 2012) ("The supplemental-jurisdiction statute, 28 U.S.C. § 1367(a), permits a court to entertain a claim that is part of the same case or controversy as the claim within a federal court's original jurisdiction").

Because Plaintiffs have failed to establish the Court's exercise of personal jurisdiction over the non-resident Defendants and have failed to state a claim for patent infringement against

Defendant IMA Industries, the Court has no basis for supplemental jurisdiction under 28 U.S.C. § 1367. *See* 28 U.S.C § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . [if] the district court has dismissed all claims over which it has original jurisdiction"). The Court, therefore, dismisses, without prejudice, Counts II and III of Plaintiffs' Complaint.

## IV.    Jurisdictional Discovery

In filing their response to Defendants' motion to dismiss, Plaintiffs moved for jurisdictional discovery. (*See* R.32.)[10] The Court's analysis of jurisdictional discovery, unlike its substantive analysis of jurisdiction, is governed by Seventh Circuit law. *See Patent Rights*, 603 F.3d at 1371 (explaining that jurisdictional discovery is reviewed under the law of the regional circuit because it is an issue not unique to patent law). Under Seventh Circuit law, "it is within the discretion of the district court to allow a plaintiff to conduct limited discovery in order to establish that jurisdiction exists." *Sanderson v. Spectrum Labs, Inc.*, 248 F.3d 1159 (7th Cir. 2000). In order to do so, however, "a plaintiff must establish a colorable or *prima facie* showing of personal jurisdiction before discovery should be permitted." *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 946 (7th Cir. 2000) ("*Reimer*"). Put differently, a plaintiff seeking jurisdictional discovery must advance "proof to a reasonable probability" of the facts necessary to establish federal jurisdiction. *Anthony v. Sec. Pac. Fin. Servs., Inc.*, 75 F.3d 311, 316 (7th Cir. 1996). The Seventh Circuit has cautioned that "[f]oreign

---

[10] The Court treated Plaintiffs' Motion for Jurisdictional Discovery as a response to Defendants' motion to dismiss and ordered Defendants to address Plaintiffs' request in addition to the substantive arguments presented by Plaintiffs, in their reply. (*See* R.36, Minute Order, Sept. 30, 2015). Defendants did so and Plaintiffs filed a reply brief. (*See* R.41.) The issue of jurisdictional discovery, is therefore fully briefed and before the Court as a separate issue for ruling.

nationals usually should not be subjected to extensive discovery in order to determine whether personal jurisdiction over them exists." *Reimer*, 230 F.3d at 946.

Plaintiffs seek jurisdictional discovery arguing that corporate relationships between the Defendants provide sufficient connections that warrant exploration.  Specifically, Plaintiffs assert that the interrelatedness of each of Defendants' advertising, corporate structure, and corporate relationships demonstrates that Defendants do not maintain corporate formalities.  Furthermore, Plaintiffs assert that Defendants' declarations make broad statements that beg for underlying details to establish their basis, e.g., Mr. Bianchi attests that no price quotes were made in Illinois but does not state whether any contacts arose out of the Pack-Expo trade show and whether those contacts resulted in any sales of their products.  Plaintiffs seek information related to Defendants' customer base in Illinois and whether they are conducting business here.  Plaintiffs, therefore, assert that depositions of each of the declarants is appropriate.  (*Id.*)

Defendants oppose Plaintiffs' request for jurisdictional discovery and move this Court to deny the motion as untimely and because Plaintiffs have not established a *prima facie* case of personal jurisdiction.  (R. 37, at 11.)  Moreover, Defendants argue that Plaintiffs have not explained why an investigation into Defendants' corporate structure would bolster a claim for personal jurisdiction.  Defendants suggest that such an inquiry is irrelevant because the jurisdictional inquiry focuses on the non-resident Defendants' contacts with the forum state, not their contacts with each other.  Lastly, Defendants argue that depositions of their declarants are improper because, now that Defendants have supplied evidence to refute the Plaintiffs' assertions of personal jurisdiction, Plaintiffs' have the burden of going beyond the pleadings and submitting affirmative evidence supporting the exercise of jurisdiction.  (*Id.*, at 14.)

Plaintiffs' request for jurisdictional discovery was timely.  Plaintiffs sought jurisdictional discovery as an alternative means in a motion filed as a response to Defendants' motion to dismiss and the issue came to the Court's attention at that time.  *Accord In re Honey Transhipping Litigation*, 87 F.Supp.3d 855, 874 (N.D. Ill. 2015) (explaining that the plaintiff's request for jurisdictional discovery "buried in a response brief rather than properly presented as a motion guarantees that a request will not come to the court's attention until the court is fully engaged in deciding the motion to dismiss).

Plaintiffs have demonstrated at least a single contact with Illinois and have alleged the possibility of additional United States contacts that, if substantiated, may support the Court's exercise of personal jurisdiction over non-resident Defendants.  As discussed *supra*, while a single trade show contact is not alone sufficient for jurisdiction, viewed in the context of additional contacts it could be.  *See e.g., Synthes*, 563 F.3d at 1298 (finding personal jurisdiction under Rule 4(k)(2) based on multiple trade show contacts and other deliberate contacts with the United States); *Patent Rights,* 603 F.3d at 1370 (finding the exercise of specific jurisdiction fair and not particularly onerous where the defendants admitted presence at numerous trade shows in the forum state).[11]  Taking the facts in the light most favorable to the Plaintiffs, the single Illinois contact Plaintiffs have alleged was on behalf of all Defendants.  (*See* R.33-1, Ex.1 (business card stating "IMA Industries" along with addresses for both FillShape and IMA S.p.A.).)  Defendant IMA S.p.A. is an Italian corporation with three wholly owned United States subsidiaries, one of which is in Illinois and two additional subsidiaries located in Massachusetts—IMA Industries

---

[11] The relevance of a request for jurisdictional discovery is determined by application of Federal Circuit law.  *See Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp.,* 395 F.3d 1315, 1323 (Fed. Cir. 2005) (*citing Truswal Sys. Corp. v. Hydro-Air Eng'g, Inc.*, 813 F.2d 1207, 1209 (Fed. Cir. 1987)).

North America and IMA North America.  (*See* R.1, ¶¶ 11-13.)  Plaintiffs further alleged that Mr. Bianchi represented IMA's "strong presence in the United States" at the Pack-Expo trade show, which, if true, may support a deliberate choice by the non-resident Defendants to be involved in the United States market through their attendance at the trade show.  (*See* R.33-1, ¶¶ 6, 8); *Nuance Commc'ns., Inc. v. Annyy Software House*, 626 F.3d 1222, 1233 (Fed. Cir. 2010) (finding personal jurisdiction exists where the defendant expressed its intention to "win the whole US market" through sales of its software program in the United States and admitted to distribution in the United States). Taking the facts and all disputes in favor of Plaintiffs, the Court finds that Plaintiffs are entitled to limited jurisdictional discovery.  *See Cent. States, Se. & Sw. Areas Pension Fund v. Phencorp Reinsurance Co.*, 440 F.3d 870, 877-78 (7th Cir. 2006) (explaining that when deciding whether jurisdictional discovery should be granted, the plaintiff "is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record").

In granting Plaintiffs' request, however, the Court does not permit wide-ranging discovery against Defendants.  *See Reimer*, 230 F.3d at 947.  Plaintiffs' request seeks discovery in two categories: (1) related to Defendants' advertising, corporate structure and corporate relationships, and (2) depositions of Defendants' declarants.  (*See* R.33, at 14.)  Plaintiffs' request is too broad and they have not justified such broad discovery based on the facts alleged and the jurisdictional arguments advanced.  Namely, that the Court has personal general jurisdiction over IMA S.p.A. based on its United States contacts as analyzed under Rule 4(k)(2) and that the Court has specific jurisdiction over Defendants IMA North America, IMA Industries North America and FillShape based on their contacts with Illinois.  To the extent that Defendant IMA S.p.A. has additional United States contacts and Defendants IMA North America, IMA

Industries North America and FillShape have additional Illinois contacts that arose from their participation in the Expo-Pack trade show, these contacts are relevant to the determination of whether the Court can exercise its power of jurisdiction over non-resident Defendants.  The Court permits Plaintiffs to explore these areas of limited jurisdictional discovery through the less burdensome and more targeted nature of written discovery.  Accordingly, the Court grants in part and denies in part Plaintiffs' request for jurisdictional discovery and limits Plaintiffs to service of five interrogatories upon Defendant IMA S.p.A. inquiring about its United States contacts and upon Defendants IMA North America, IMA Industries North America and FillShape inquiring about their Illinois contacts as a basis for the Court's exercise of personal jurisdiction.

## CONCLUSION

For the reasons stated above, the Court grants Defendants' Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6).  The Court further grants in part and denies in part Plaintiffs' request for jurisdictional discovery.  In doing so, the Court dismisses Plaintiffs' Complaint without prejudice and grants Plaintiffs leave to replead by February 2, 2016.

**Dated: December 9, 2015**                     ENTERED

                                                                    _____
                                                                    AMY J. ST. EVE
                                                                    United States District Court Judge

42